IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                    No. CR 10-3237 LH

JOSEPH EARL CARROLL,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Joseph Earl Carroll's Motion to Suppress Evidence Obtained as a Fruit of Unlawful Seizure, and Supporting Memorandum (Doc. 19). The Court held a hearing on this motion on April 19, 2011. The Court, having considered the motion, briefs, arguments of counsel, relevant case law, and evidence presented at the hearing, finds that the motion should be denied.

### I.    FACTUAL FINDINGS

Federal Rule of Criminal Procedure 12(d) requires the Court to state its essential findings on the record when deciding a pretrial motion that involves factual issues. The Court finds that the testimony of Officer Luis Castaneda of the Albuquerque Police Department ("APD") was credible. The Court makes the following additional findings of fact.

On November 5, 2010, a woman called 911 stating that there was a suspicious car sitting in the parking lot of the apartment complex at 136 General Arnold. She said that her boyfriend asked the driver to leave, he did not leave, and he had been sitting there all night. She also advised that the vehicle left at one point, but then returned. She said that he is here every day and she does not

know who he is or why he is here.  She described the driver as a 35 year-old black male and the vehicle as a black Corsica.  From the call, it appeared that the caller lived in the apartments.  She mentioned that her son's nurses were at the apartment complex to take care of him.  (*See* Government's Ex. 1 (Transcript of phone call).)

Dispatch communicated the call to APD.  Dispatch reported that an anonymous caller advised there is a 35 year-old black male in a black Corsica who has been in his vehicle all night at the 136 General Arnold Street apartments, he left, but returned and that the male has been doing this for the past two to three days.  Dispatch conveyed that the caller requested police to check on the male suspect.  (*See* Government's Ex. 2 (CAD sheet).)

APD Officer Luis Castaneda received the dispatch concerning the suspicious person sitting in the vehicle and responded to the dispatch at approximately 2:16 p.m.  Officer Castaneda received the same information in the CAD sheet that is accurately reflected in Government's Exhibit 2.  Officer Castaneda never spoke to the caller.  The caller's phone number and exact apartment number have been redacted from the CAD sheet.

Officer Castaneda has been an APD officer for 16 years.  He has been assigned to the Southeast area command, in which the apartments at 136 General Arnold are located.  He has responded to calls in the area where the 136 General Arnold apartments are located approximately 100 to 200 times for various crimes ranging from shootings, stabbings, domestic violence, drug trafficking, shots fired, and prostitution.  Weapons have often been involved in the prior calls, particularly with respect to drug trafficking calls.  It is a high crime area.

Officer Castaneda arrived at the 136 General Arnold apartments at approximately 2:20 p.m.  Officer Castaneda was alone, in a marked vehicle, and in uniform.  The 136 General Arnold apartment complex has two stories and houses several residents.  It has its own parking lot.  There

was a dumpster by the sidewalk near the entrance to the parking lot.

When Officer Castaneda arrived at the 136 General Arnold apartments, he observed two vehicles in the parking lot. Officer Castaneda observed that one of the vehicles, a black Corsica, matched the description provided by the caller. The Corsica had backed into the parking lot, so that its license plate was not visible from Officer Castaneda's location. The Corsica was parked at an angle that provided a tactical position in that a person inside would have "cover" from the broad side of the car and could more easily monitor traffic going by and into the parking lot. The Corsica had tinted windows, so despite the daylight, Officer Castaneda could not see inside the car and did not know how many, if any, people were in the car.

Officer Castaneda intended to park near the dumpster, but when he pulled up next to the dumpster to park, he observed Defendant quickly exit the Corsica's rear passenger side door. Defendant appeared to be attempting to leave the scene in haste. The speed at which Defendant exited the car led Officer Castaneda to believe that Defendant wanted to run or separate himself from what was going on inside the car. Defendant's appearance matched the caller's description sent through dispatch. At this point, based on the information he had and what he observed, Officer Castaneda had a suspicion that Defendant might be committing criminal trespass and/or engaged in drug trafficking.

Officer Castaneda parked at an angle in the parking lot so that the front of his police car would give him cover. Officer Castaneda exited his vehicle, and due to his concern for his safety, he unholstered his firearm and placed it down next to his right thigh. He stood in a "bladed" position in which his side was facing Defendant, so that his profile would be small. His weapon was at the side facing away from Defendant. Officer Castaneda never pointed his firearm at Defendant at any point in time. Officer Castaneda was approximately 15 feet from Defendant and Defendant

3

was approximately four to five feet from the car.

Officer Castaneda told Defendant to sit on the curb. At this point, Officer Castaneda subjectively believed Defendant was not free to leave. Defendant stopped leaving the scene in the direction he was heading, but instead of complying with Officer Castaneda's command to sit on the curb, he took a step towards his car saying that he left a cigarette on the seat. Officer Castaneda, for officer safety reasons, did not want Defendant to go into the car, because he was concerned, given the high crime area, that a weapon might be in the car, so he again instructed Defendant to sit on the curb. Defendant again took a step toward the car, ignoring Officer Castaneda's command to sit on the curb, and mentioned a lit cigarette. Officer Castaneda, with a raised voice, repeated his instruction to take a seat now, and this third time, Defendant complied and sat on the curb.

Officer Castaneda then called for backup with the radio on his uniform at around 2:24 p.m. He requested assistance because of his concerns for officer safety based on the high crime area, Defendant's repeated failure to comply with his command to sit on the curb, and Defendant's repeated attempts to access the car. After Officer Castaneda called for backup, Defendant stated, without any questioning, that he was just smoking marijuana in the car. Officer Castaneda, however, did not believe him because he did not smell marijuana.

At 2:28 p.m., Officers Eric Martinez and Charles Miller arrived to assist Officer Castaneda. Officer Castaneda then approached Defendant and looked into the ajar door of the car from which Defendant exited. Through the open rear passenger door, Officer Castaneda saw what he believed to be a glass crack cocaine pipe in plain view. Officer Castaneda then told Defendant to turn around with his hands on his head, which he did. Officer Castaneda then did a pat-down search of Defendant. He did not find any contraband at this time. Officer Castaneda took Defendant's license to do a warrants check.

The warrants check revealed Defendant had three misdemeanor arrest warrants. Officer Castaneda waited 10 minutes for NCIC to confirm that the warrants were valid. During this time, Defendant remained on the curb with the other two back-up officers next to him. When NCIC confirmed that the warrants were valid, Officer Castaneda handcuffed Defendant and did another thorough pat-down search during which Officer Castaneda found six 9 mm bullets on Defendant. Officer Castaneda asked where the gun for the bullets was, and Defendant replied "at home." Officer Castaneda then placed Defendant in his patrol car. This arrest occurred at around 2:58 p.m.

Officer Castaneda subsequently conducted an inventory search of Defendant's vehicle. He decided to tow the vehicle because the information he had indicated the vehicle was not owned by anyone living in the apartment complex. The vehicle was registered to an unknown second person, the vehicle's license had expired, and, according to his driver's license, Defendant resided in Rio Rancho, New Mexico. It is APD's policy to tow vehicles in such circumstances to protect APD from liability by ensuring the car is not abandoned or it or its contents stolen. In the car, Officer Castaneda found a box of 9 mm ammunition and, in the back seat under a backpack, a 9 mm handgun. He also found a spoon with a white powder residue consistent with an illegal narcotic, although the substance was never tested.

Officers later learned that Defendant was a felon. Officer Castaneda left the scene on route to the jail at approximately 4:56 p.m.

## II.   ANALYSIS

Defendant contends that there was no reasonable suspicion of criminal activity to justify Officer Castaneda seizing him when he did. Defendant asserts that he was seized when he, in acquiescence to Officer Castaneda's commands, refrained from leaving the scene as he initially sought to do. Defendant argues that the report of a man being "suspiciously parked" for two to three

days and sometimes leaving and then returning does not give rise to reasonable suspicion that he has committed a crime. The United States contends that Defendant was not seized until he complied with Officer Castaneda's third command to sit and that the totality of the circumstances provided reasonable suspicion to detain Defendant.

### A. Defendant was not seized until he complied with Officer Castaneda's command to sit on the curb

A seizure under the Fourth Amendment requires either physical force, such as the laying on of hands or the application of physical force to restrain movement, or the submission to the assertion of authority. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991). In this case, although Defendant, upon Officer Castaneda's first command to sit on the curb, stopped leaving in the direction he initially took away from the car and began speaking with Officer Castaneda, he continued to try to head for his car and repeatedly refused to comply with Officer Castaneda's command to sit on the curb. Despite Officer Castaneda's commands, Defendant repeatedly attempted to move away from Officer Castaneda towards the car. He thus did not terminate his movement or submit to Officer Castaneda's authority until he sat on the curb after Officer Castaneda's third command to sit. *Cf. United States v. Salazar*, 609 F.3d 1059, 1064-67 (10th Cir. 2010) (holding that defendant did not submit to trooper's authority until he complied with command to get out of truck); *Reeves v. Churchich*, 484 F.3d 1244, 1248-53 & n.17 (10th Cir. 2007) (holding that two individuals were not "seized" when officers pointed their guns at them and ordered them not to move because individuals failed to submit to officers' assertions of authority).[1]

---

[1] At the April 19, 2011 hearing, the Court stated that Defendant was not "arrested" before Defendant actually complied with the officer's requests to sit on the curb. The Court should have used the term "seized," not "arrested." The Court finds that Defendant was first "detained" when he finally complied with Officer Castaneda's command to sit on the curb. Defendant was not "arrested" until he was handcuffed.

That Officer Castaneda subjectively believed Defendant was not free to leave at his first command is not dispositive, because the reasonableness standard is an objective one. *See Hodari D.*, 499 U.S. at 627-28. Officer Castaneda's actions and commands certainly constituted a "show of authority," but a "seizure" does not occur unless the subject complies with that show of authority. *See id.* at 628-29 ("In sum, assuming that Pertoso's pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled.").

### B.   Reasonable suspicion supported Defendant's seizure

An investigative detention is an exception to the probable cause requirement. *See Terry v. Ohio*, 392 U.S. 1, 26 (1968). To determine whether an investigative detention is reasonable, the court must determine: (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place. *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995). An investigative detention may only last as long as necessary to effectuate the purpose of the stop. *See United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003). The scope of the detention must be carefully tailored to its underlying justification. *Id*.

Although anonymous tips raise difficult Fourth Amendment questions because they rarely allow authorities to assess the informant's veracity, reliability, or basis of knowledge, there are situations when an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop. *United States v. Copening*, 506 F.3d 1241, 1246 (10th Cir. 2007) (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000)). Relevant factors include (1) whether the informant lacked "true anonymity" (*i.e.*, whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported

contemporaneous, first-hand knowledge; (3) the informant's motivation for calling; and (4) whether the police were able to corroborate information provided by the informant. *See United States v. Brown*, 496 F.3d 1070, 1078-79 (10th Cir. 2007).

The facts here give sufficient reliability to the 911 caller for Officer Castaneda to rely on the facts conveyed by dispatch from the caller. The 911 caller, although wishing to remain anonymous, did not block her telephone number and indicated that she lived in the apartments at 136 General Arnold, so police had means to discover her identity. The caller reported contemporaneous, first-hand information and expressed concern that a suspicious vehicle was parked in the parking lot and would not leave, indicating a good-faith motive by an ordinary citizen to protect the individuals and public. Finally, the caller relayed to 911 a description of the vehicle and driver, which matched the description of the vehicle and Defendant that Officer Castaneda observed in the same parking lot. Although the call may not have been enough in and of itself to prove that a specific crime was occurring, it did give Officer Castaneda articulable grounds to initiate a police-citizen contact to verify or dispel the caller's concerns. *Cf. Copening*, 506 F.3d at 1246-47 (holding that 911 calls had requisite reliability to justify stop of truck where caller called from unblocked telephone number, he gave detailed first-hand information that suggested ordinary citizen acting in good faith, and officer corroborated caller's real-time account of truck's travel route before initiating stop); *United States v. McCranie*, 703 F.2d 1213, 1217 (10th Cir. 1983) (explaining that, even if officer did not have sufficient grounds to seize suspect, officer had adequate reasons to initiate police-citizen contact to verify his suspicions concerning unusual one-way flight to Florida).

Moreover, Officer Castaneda had a community care-taking purpose for approaching Defendant and asking him questions. An officer may briefly detain a person, regardless of any suspected criminal activity, where the officer has specific and articulable facts to warrant an

8

intrusion into the person's liberty to ensure the safety of the public. *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993).

When Officer Castaneda arrived in the parking lot and began to park, Defendant immediately exited the Corsica and began to leave the scene in haste. Such unprovoked flight and nervous, evasive behavior upon noticing police is a factor relevant to the reasonable suspicion analysis. *Cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting that unprovoked flight and other nervous, evasive behavior upon noticing police is pertinent factor in determining reasonable suspicion); *United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009) ("Furtive movements, nervousness, and the fact that conduct occurs in an area known for criminal activity are all appropriate factors to consider in determining whether reasonable suspicion exists."); *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) (noting that defendant's arrival at premises being searched, suddenly turning around, and attempting to leave after car came in view of police activity gave reasonable suspicion to justify stop). The fact that Defendant was located in a high crime area is also a relevant contextual consideration to the reasonable suspicion analysis. *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009) (quoting *Wardlow*, 528 U.S. at 124).

Finally, Defendant did not initially comply with Officer Castaneda's commands. Instead, he repeatedly attempted to get back to the car because of an alleged burning cigarette in the car, even though moments earlier, he attempted to separate himself quickly from that same car, suggesting his purported concerns were not genuine. Defendant's behavior gave Officer Castaneda further reasons to be concerned for his safety and suspect a possible crime was occurring.

Based on the totality of the facts, the Court finds that Officer Castaneda had a reasonable suspicion to seize Defendant to conduct a brief investigation.

## III.   CONCLUSION

Officer Castaneda did not "seize" Defendant until Defendant complied with his third command to sit on the curb. Officer Castaneda's initial and continued detention of Defendant were supported by reasonable suspicion, and therefore, he did not violate Defendant's Fourth Amendment rights. Accordingly, Defendant's motion to suppress will be denied.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence Obtained as a Fruit of Unlawful Seizure, and Supporting Memorandum (**Doc. 19**) is **DENIED**.

_____
SENIOR UNITED STATES DISTRICT JUDGE